Paul Hoffman, SBN 71244
Michael Seplow, SBN 150183
John Washington, SBN 315991
Schonbrun SeplowHarris Hoffman &
Zeldes LLP
200 Pier Avenue #226
Hermosa Beach, California 90254
t. 310 396-0731
e. hoffpaul@aol.com
e. mseplow@sshhzlaw.com
e. jwashington@sshhlaw.com

David Loy SBN 229235
Aaron R. Field SBN 310648
First Amendment Coalition
534 4th St., Suite B
San Rafael, CA 94901
t. (415) 460-5060
e. dloy@firstamendmentcoalition.org
e. afield@firstamendmentcoalition.org

Susan E Seager SBN 204824
Law Office of Susan E. Seager
128 N. Fair Oaks Avenue
Pasadena, CA 91103
t. (310) 890-8991
e. susanseager1999@gmail.com

Carol A Sobel SBN 84483
Weston Rowland SBN 327599
Law Office of Carol A. Sobel
2632 Wilshire Boulevard, #552
Santa Monica, CA 90403
t. 310 393 3055
e. carolsobellaw@gmail.com
e. rowland.weston@gmail.com

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| LOS ANGELES PRESS CLUB, STATUS COUP, THE SOUTHLANDER,<br><br>Plaintiffs,<br><br>v.<br><br>COUNTY OF LOS ANGELES, LOS ANGELES COUNTY SHERIFF ROBERT LUNA, sued in his official capacity;<br><br>Defendants. | CASE NO.: COMPLAINT FROM DECLARATORY AND INJUNCTIVE RELIEF<br><br>42 U.S.C. § 1983:  U.S. CONSTITUTION: FIRST, FOURTH, AND FOURTEENTH AMENDMENTS CALIFORNIA CONSTITUTION, ARTICLES 1, §§ 2, 3, 7, 13 CALIFORNIA CIVIL CODE § 52.1; CALIFORNIA PENAL CODE § 409.7; CALIFORNIA PENAL CODE § 13625 |

## I. INTRODUCTION

1. Despite recent legislation designed to protect the First Amendment rights of journalists and protesters, reporters covering the recent protest continue to be at risk for serious injuries as a result of the unlawful conduct of the Los Angeles County Sheriff's Department ("LASD"). This case responds to the continuing and escalating use of excessive force and the violation of constitutional and statutory rights by LASD deputies against journalists during recent protests in downtown Los Angeles and throughout the County against federal immigration policies. Dozens of journalists from around the world were present during these protests to record and report on the events as they unfolded. These journalists were not engaged in protest or unlawful activity and were exercising their First Amendment rights and safeguarding the First Amendment rights of all members of the community.

2. The protests against the Trump administration and its policies are ongoing and likely to continue for the foreseeable future. The LASD's use of excessive force against journalists during the June 2025 protests has had a chilling effect on their ability to report on these protests. It repeats the conduct already enjoined by the federal court following the 2020 George Floyd protests and other events where the public gathered in public places to express their views about the government in general and the LASD actions in particular. Accordingly, unless this Court takes action to stop the wrongful actions of the LASD against journalists, Plaintiffs and members of the press will suffer irreparable harm.

3. The LASD has a long history, as set forth below, of using excessive force against demonstrators and the press in protests. Because of what law enforcement agencies throughout the State of California did in response to the 2020 Floyd protests, the Legislature enacted two measures, adding to the Penal Code and detailing restrictions on the use of force as crowd control methods and ensuring safe access for the press.

4. Given that long history and the 2021 additions to the California Penal Code, LASD actions during the June 2025 protests in downtown Los Angeles reveal a brazen refusal to abide by the Constitution and state law. This action seeks injunctive and declaratory relief to require that the LASD respect the constitutional and statutory rights of journalists engaged in reporting on these protests and inevitable protests to come.

## II.   JURISDICTION AND VENUE

5. This is an action for injunctive relief for violations of Plaintiffs' federal and state constitutional, state statutory rights and their members' constitutional and statutory rights. Jurisdiction exists pursuant to 28 U.S.C. §§ 1331 and 1343 as Plaintiffs assert a claim under 42 U.S.C. § 1983. Jurisdiction also exists pursuant to 28 U.S.C. §§ 2201(a) and 2202, the Declaratory Judgment Act. The Court has supplemental jurisdiction to consider Plaintiffs' state law claims under 28 U.S.C. § 1367 as these state law claims arise from the same common nucleus of operative facts as Plaintiffs' federal claims.

6. Venue is proper in the Western Division of the Central District of California pursuant to 28 U.S.C. § 1391(b) because the events and conduct giving rise to Plaintiffs' claims all occurred in the City and County of Los Angeles.

## III.   PARTIES

### A.   Plaintiffs

7. Plaintiff **LOS ANGELES PRESS CLUB ("LASC")** is a 501(c)(3) nonprofit organization with no parent corporation and no stock. The organization has more than 1,000 member journalists and news organizations in Southern California and has operated since 1913 to support, promote and defend quality journalism. The LAPC has been very active since the June 2025 protests in downtown Los Angeles, and elsewhere in Los Angeles County, in monitoring and responding to attacks on journalists during the protests. LAPC has been required to divert resources, money and staff time, to respond to these attacks which are at the core of its mission for

the community and its members. LAPC members have also suffered excessive force and harassment by LAPD officers and continue to be threatened with such injuries and violations as protests continue.

8. Plaintiff **STATUS COUP** is an independent investigative reporting network and media outlet that focuses on in-field and investigative reporting. Status Coup's Los Angeles based reporters are members of the Los Angeles Press Club. Status Coup regularly sends journalists into the field to investigate and report on protests in the City of Los Angeles. Status Coup has journalists on the ground during the June 2025 protests. Status Coup reporters have been subjected to force by LASD Deputies while filming protests.

9. Plaintiff **THE SOUTHLANDER** is the only dedicated investigative news cooperative serving Greater Los Angeles. It is a worker-led nonprofit newsroom based in Los Angeles, Long Beach, and Orange County. The Southlander reporters have been subjected to force by LASD deputies during the ICE protests. One such incident involved The Southlander journalist Ben Camacho, who was shot twice by LASD deputies as he assisted injured photographer Nick Stern, as discussed below.

**B.  Defendants**

9. Defendant **COUNTY OF LOS ANGELES** is a municipal corporation duly organized and existing under the Constitution and laws of the State of California. The LASD is an agency of County of Los Angeles and all actions of the LASD are the legal responsibility of the County. At all relevant times, Defendant County was responsible for assuring that the actions, omissions, policies, practices, and customs of the LASD and its employees and agents complied with the laws of the United States and the State of California.

10. Defendant **SHERIFF ROBERT LUNA** was, at all times relevant to this action, the Los Angeles County Sheriff and a policymaker for the department. He is sued in his official capacity.

11. Plaintiffs are informed, believe, and thereupon allege that **DOES 1 through 10** were agents, servants, or employees of Defendant County and the LASD. Plaintiffs are ignorant of the true names and capacities sued herein as Does 1 through 10, inclusive, and therefore sue these Defendants by such fictitious names. Plaintiffs will amend this Complaint to allege their true names and capacities when ascertained.

12. Plaintiffs are informed, believe, and thereupon allege that at all times relevant hereto Does 1 through 10, in addition to the named Defendants, are responsible in some manner for the damages and injuries alleged herein.

13. Plaintiffs are informed, believe, and thereupon allege that at all times relevant hereto, Defendants, and each of them, were the agents, servants, and employees of the other Defendants and were acting at all times within the scope of their agency and employment and with the knowledge and consent of their principal and employer. At all times, Defendants acted under the color of state law.

14. Plaintiffs are informed, believe, and thereupon allege that Defendant County's policies and failure of policies, including the failure to train its deputies in constitutional and lawful responses to the rights of the press at demonstrations, caused the unlawful action taken against Plaintiffs.

### IV. STATEMENT OF FACTS

15. Starting on Saturday June 7, 2025, in Paramount, California, widespread protests against federal immigration policy and actions started. These protests spread to other parts of Los Angeles County in the days after the Paramount protests, in particular, in downtown Los Angeles. LASD deputies were involved in the policing of these protests. The several days of protests starting June 7, 2025 to date are referred to as the "June 2025 protests."

16. During the June 2025 protests LASD deputies targeted members of the press with less lethal munitions and otherwise engaged in excessive force against members of the press. These press members were not engaged in unlawful

behavior and gave deputies no reason to engage in force against them and thereby deny them their rights under the United States and California constitutions and California Penal Code §§ 409.7 and 13625.

17. The following are examples of members of the press subjected to excessive force by the LASD. These examples illustrate the manner in which LASD deputies violated the constitutional and statutory rights of the press.

18. **Nick Stern** – On June 7, 2025, Nick Stern, a freelance British photojournalist, wearing a prominent press pass, was documenting events in Paramount when LASD deputies opened fire with less lethal weapons. He was hit in the leg with a less lethal munition which required emergency surgery. See https://www.latimes.com/california/story/2025-06-11/lapd-treatment-journalists;




https://www.youtube.com/watch?v=HHpxfc0saCY.

19. **Ben Camacho** - On June 7, 2025, Ben Camacho, a journalist and co-founder of The Southlander, was helping the injured photojournalist Nick Stern to safety when Mr. Camacho too was hit near his kneecap by a less lethal munition fired by LASD deputies. See https://latimes.com/california/story/2025-06-11/lapd-treatment-journalists. Mr. Camacho, who was wearing a press pass around his neck, was struck a second time by another LASD munition in the elbow

moments later. https://pressfreedomtracker.us/all-incidents/journalist-shot-with-crowd-control-munitions-at-immigration-protest-near-la/;




https://www.youtube.com/watch?v=x4_04ElOKcg

20. **J.W. Hendricks** - On June 7, 2025, Photojournalist J. W. Hendricks was in the street approximately 100 feet from the sheriff's skirmish line when he was hit in his leg with a less lethal munition despite his prominent "Press" vest. https://bsky.app/profile/adamrose.bsky.social/post/3lr4kfaqj222k



7
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

21. **Tina Berg -** On June 11, 2025 Tina Berg, a journalist with Status Coup News, was hit with a Kinetic Impact Projectile, (KIP), fired by LASD deputies as she was filming deputies. At the time, she was wearing a Kevlar because of what she had observed on prior days with KIPs being shot indiscriminately at protestors and press. The Kevlar protected against more serious injury from a direct shot but still left bruising.



22. On June 7, 2025 **Abraham Márquez** was filming a LASD skirmish line in Paramount for The Southlander. While filming he saw a deputy aim a less lethal launcher in his direction. Márquez raised his press credential yelling "PRESS, PRESS" and turned to run in the opposite direction of the skirmish line. As he did so he felt multiple less lethal munitions strike his back and buttocks. https://www.latimes.com/california/story/2025-06-11/lapd-treatment-journalists

23. On June 14, 2025, at 4:00 p.m., NBC News correspondent **Jacob Soboroff** was reporting from the streets in Los Angeles when LASD started using aggressive crowd control tactics against protesters, including firing less lethal munitions. Soboroff was forced to flee as LASD deputies fired munitions and trampled protestors with horses. Soboroff described the demonstrations he observed up to then as peaceful with no justification for the sudden force. See https://youtu.be/Sb7FvNbXLZ0



24. At one point, the use of force by the LASD in downtown Los Angeles was so uncontrolled that sheriff's deputies were shooting less lethal munitions at LAPD officers who were in the same general area near Temple and Main streets. The incident was recorded on the LAPD's radio scanner system, with an officer proclaiming in horror that they were being shot by LASD. "We're still taking gas and less-lethal munitions from the Sheriffs over on Temple and Main," one LAPD officer said on the LAPD radio. "Hold your goddamn crossfire."

https://lapublicpress.org/2025/06/ice-police-protest-lapd-lasd-tear-gas; See also, https://youtu.be/p53sy1anVvI.

25. These are only a few of the many incidents in which LASD deputies hit, or attempted to hit, members of the press with less lethal munitions. The widespread use of such force against members of the press underscores the LASD's failure to live up to its obligations under constitutional and statutory law and the need for judicial intervention to prevent future abuses.

26. The LASD's use of excessive force against members of the press covering protests is part and parcel of the LASD's official policy, practice and custom of violating the First and Fourth amendment rights of protesters and journalists. Indeed, in response to the LASD's use of excessive force against protesters in the wake of the murder of George Floyd, the LASD was subject to Preliminary Injunction issued on July 6, 2021, in the case of *Berg v. County of Los Angeles*, No. CV 20-7870-DMG (PDx) [Dkt. #101] by the Hon. Dolly M. Gee of the U.S. District Court for the Central District of California, which became effective on August 1, 2021.

27. In particular the Preliminary Injunction in the *Berg* case states in relevant part:

> 1. The Los Angeles Sheriffs' Department is hereby enjoined from using less lethal weapons, including foam rounds, pepper balls, tear gas canisters, flash bang grenades, and stinger grenades, against any persons peacefully attending a protest, march, or other lawful gathering unless reasonable, proportional, and targeted action is necessary to protect against a specific imminent threat of physical harm to officers or identifiable others, to respond to specific acts of violence or destruction of property, or to enforce a declaration of unlawful assembly and dispersal order pursuant to California Penal Code section 409.1
> 
>> a. If reasonable, proportional, and targeted use of less-lethal projectiles or chemical agents is necessary, foam rounds and any projectile designed to be target-specific shall be aimed at individuals causing the actual or imminent threats of harm, violence, or destruction of property and shall not be indiscriminately fired.

    b. Flash bang grenades, tear gas canisters, and other less-lethal means designed to be non-target-specific may be used in the manner they were designed to be used and shall not be deliberately aimed to strike individuals.

2. Whenever feasible, Los Angeles Sheriffs' Department officers shall issue warnings and/or declare unlawful assembly before the reasonable, proportional, and targeted use of less-lethal projectiles or chemical agents.
    a. Warnings must be given and repeated by means reasonably calculated to ensure that the warnings are heard.
    b. When warnings are given, reasonable time shall be given to comply.

28. Although the *Berg* case was not brought on behalf of journalists, the LASD's use of less lethal munitions against journalists during the June 2025 protests is a clear violation of the Preliminary Injunction protecting "persons peacefully attending a protest" in the *Berg* case.

**PENAL CODE SECTION 13652**

29. In addition to violating the Preliminary Injunction in the Berg case, the use of less lethal munitions against non-violent journalists covering the June 2025 protests also violates Penal Code Section 13652, which was enacted in the wake of excessive police response to the George Floyd protests and became effective January 1, 2022. Penal Code Section 13652 provides in relevant part:

> Except as otherwise provided in subdivision (b), kinetic energy projectiles and chemical agents shall not be used by any law enforcement agency to disperse any assembly, protest, or demonstration.
> (b) Kinetic energy projectiles[1] and chemical agents[2] shall only be deployed by a peace officer that has received training on their proper

---

[1] "Kinetic energy projectiles" means any type of device designed as less lethal, to be launched from any device as a projectile that may cause bodily injury through the transfer of kinetic energy and blunt force trauma. For purposes of this section, the term includes, but is not limited to, items commonly referred to as rubber bullets, plastic bullets, beanbag rounds, and foam tipped plastic rounds.

[2] "Chemical agents" means any chemical that can rapidly produce sensory irritation or disabling physical effects in humans, which disappear within a short time following termination of exposure. For purposes of this section, the term includes, but is not limited to, chloroacetophenone tear gas, commonly known as

use by the Commission on Peace Officer Standards and Training for crowd control if the use is objectively reasonable to defend against a threat to life or serious bodily injury to any individual, including any peace officer, or to bring an objectively dangerous and unlawful situation safely and effectively under control, and only in accordance with all of the following requirements:

(1) Deescalation techniques or other alternatives to force have been attempted, when objectively reasonable, and have failed.
(2) Repeated, audible announcements are made announcing the intent to use kinetic energy projectiles and chemical agents and the type to be used, when objectively reasonable to do so. The announcements shall be made from various locations, if necessary, and delivered in multiple languages, if appropriate.
(3) Persons are given an objectively reasonable opportunity to disperse and leave the scene.
(4) An objectively reasonable effort has been made to identify persons engaged in violent acts and those who are not, and kinetic energy projectiles or chemical agents are targeted toward those individuals engaged in violent acts. Projectiles shall not be aimed indiscriminately into a crowd or group of persons.
(5) Kinetic energy projectiles and chemical agents are used only with the frequency, intensity, and in a manner that is proportional to the threat and objectively reasonable.
(6) Officers shall minimize the possible incidental impact of their use of kinetic energy projectiles and chemical agents on bystanders, medical personnel, journalists, or other unintended targets.
(7) An objectively reasonable effort has been made to extract individuals in distress.
(8) Medical assistance is promptly provided, if properly trained personnel are present, or procured, for injured persons, when it is reasonable and safe to do so.
(9) Kinetic energy projectiles shall not be aimed at the head, neck, or any other vital organs.
(10) Kinetic energy projectiles or chemical agents shall not be used by any law enforcement agency solely due to any of the following:
    (A) A violation of an imposed curfew.
    (B) A verbal threat.
    (C) Noncompliance with a law enforcement directive.
(11) If the chemical agent to be deployed is tear gas, only a commanding officer at the scene of the assembly, protest, or demonstration may authorize the use of tear gas.

**SENATE BILL 98**

---

CN tear gas; 2-chlorobenzalmalononitrile gas, commonly known as CS gas; and items commonly referred to as pepper balls, pepper spray, or oleoresin capsicum.

30. In 2021, California Governor Newsom signed into law Senate Bill 98, ensuring protections for the press to observe and record law enforcement activities at public protests. The Legislature recognized that, "[w]hile [existing] California law protects members of the press from being stopped when entering closed areas during emergencies and natural disasters to gather information, these protections don't extend to protest events such as demonstrations, marches, protests, or rallies where individuals largely engage their First Amendment right to speech." 2021 California Senate Bill No. 98, California 2021-2022 Regular Session, available at https://trackbill.com/s3/bills/CA/2021/SB/98/analyses/assembly-public-safety.pdf.

31. The bill's author stated that law was enacted in response to widespread assaults and arrests of reporters covering the protests in response to the killing of George Floyd. "In California and across the country police have arrested, detained, and have physically assaulted journalists with rubber bullets, pepper spray, tear gas, batons, and fists. In many cases there are strong indications that the officers injuring journalists knew their targets were members of the press. Members of the press risk their personal safety and wellbeing each time they attend protest events to get the public the information they need, but rubber bullets, teargas, and even arrest cannot be the norm for an essential pillar of our democracy." *Id.*

32. SB 98 SEC. 2. added Section 409.7 to the Penal Code, which reads as follows, in part:

> 409.7. (a) If peace officers … close the immediate area surrounding any emergency field command post or any other command post, or establish a police line, or rolling closure at a demonstration, march, protest, or rally where individuals are engaged in activity that is protected pursuant to the First Amendment to the United States Constitution or Article I of the California Constitution, the following requirements shall apply:
>
> (1) A duly authorized representative of any news service, online news service, newspaper, or radio or television station or network may enter the closed areas described in this section.
>
> (2) A peace officer or other law enforcement officer shall not intentionally assault, interfere with, or obstruct the duly authorized representative of any news service, online news service, newspaper, or

radio or television station or network who is gathering, receiving, or processing information for communication to the public.

## V. MONELL ALLEGATIONS

33. The County of Los Angeles, acting through the Los Angeles Sheriff's Department and Sheriff Luna, failed to conduct training on the use of force for crowd control in general and on the rights of members of the press at protests specifically. The need for training was obvious from a number of incidents during the 2020 George Floyd protests and subsequent protests.

34. On May 30, 2020, LASD deputies were present when the LAPD broke up a large peaceful protest organized by Black Lives Matter at Pan Pacific Park after the killing of George Floyd by the police in Minneapolis.  LASD deputies fired projectiles and tear gas indiscriminately at non-violent protesters.  The use of the munitions was enormous and indiscriminate. The LASD fired a variety of KIPS, including at least 1,500 pepper balls, twenty 40 mm rounds, 10 "blast" ball grenades and 10 sting ball grenades.

35. In addition to shooting peaceful protestors, the LASD attacked members of the press documenting the LASD's unlawful conduct. One of the reporters assaulted by the LASD on May 30, 2020 was Josie Huang.  In 2023, Ms. Huang, a reporter for NPR member station LAist 89.3 (formerly known as KPCC), was paid $700,000 to settle her claim over her violent and unlawful arrest by the LASD while using her cell phone to film deputies and a peaceful protest on September 12, 2020. Deputies tackled Ms. Huang to the ground, injuring her, and stomped on her cell phone in an effort to destroy evidence of her violent arrest.[3]

---

[3] More than 50 years ago, on August 29, 1970, two LASD deputies fired several tear gas cannisters into a crowded bar during the National Chicano Moratorium March against the Vietnam War in East Los Angeles. One of those cannisters hit Los Angeles Times columnist and leading Latino civil rights activist Ruben Salazar in the head, killing him instantly. More than 50 years ago, the County paid his family $700,000 to settle their lawsuit. https://documents.latimes.com/salazar-

36. The settlement in the Huang case required the LASD to provide deputies with briefings on press rights before patrol assignments to respond to protests and issue written guidance to all employees on the laws and policies governing their interactions with members of the news media, including SB-98, legislation that protects journalists' rights to cover demonstrations, whose passage was spurred in part by public outrage at Huang's detention. https://www.rcfp.org/josie-huang-la-county-settlement,

37. More specifically, the LAPD failed to enact an adequate policy or convey that policy to its employees to ensure the protection of the rights protected in SB 98 and California Penal Code §409.7. The need for training was obvious. based on a series of incidents following the 2020 George Floyd protests.

38. On August 25, 2020, a lawful, peaceful demonstration of approximately 100 people marched through the streets of downtown Los Angeles and were shot by the LASD using less-lethal projectiles and tear gas against the demonstrators. They were marching to the County jail, a County of Los Angeles facility, protesting the Pasadena killing of Anthony McClain, where they encountered barricades described as a "giant slinky." The protest reversed direction and then marched back in the direction of Los Angeles City Hall. Without any warning, dispersal order, or declaration of an unlawful assembly, LASD deputies fired KIPS, pepper balls, and tear gas at the non-violent demonstrators as they reached Broadway and Temple, effectively terminating the demonstration.

39. In that same incident, the LASD deliberately targeted two legal observers from the NLG-LA, readily identifiable by their green hats, with a tear

---

independent-office-review/. Although several government reviews concluded the LASD did not intentionally target Mr. Salazar, his killing at the hands of deputies was deemed the result of poor training when dealing with protests and has created a longstanding mistrust of the LASD's actions against the press. Little, if anything, has changed since.

gas grenade. The legal observers were apart from the demonstrators and following directions from LASD deputies to move across the street when they repeatedly shot with KIPs in the legs and flash grenades as they ran away.

40. Barely one week later, on September 5, 2020, the LASD used unlawful force against a demonstration of approximately 250-300 people protesting the recent killing by LASD deputies of Dijon Kizzee, a Black man riding a bicycle. The protest was on Imperial Highway outside the Sheriff's station in South Central Los Angeles. As the group listened to various speakers, LASD deputies in full riot gear opened fire on the assembled group without warning. The deputies indiscriminately shot a variety of KIPs, pepper balls, flash bangs, and tear gas grenades.

41. On September 8, 2020, the LASD chased down and violently arrested Cal State Long Beach student journalist and freelance photographer Pablo Unzueta as he was peacefully filming one of the Dijon Kizzee protests from the sidewalk on Imperial Highway, ignoring his repeated statements that he was press and that he had his press pass, jailing him, confiscating his camera and cell phone, invading his privacy by repeatedly strip searching him at the jail, and returning his camera without its memory card. The County paid $90,000 to settle his civil rights lawsuit.

42. The Kizzee protests at the Sheriff's station continued peacefully for days. During that time, the riot-gear clad Sheriff's deputies surrounded the protestors in an obious attempt to intimidate them. On September 11, 2020 a press conference was called by the National Lawyers Guild at which the demonstrators voiced complaints about the LASD's mistreatment of them. Again, LASD deputies dressed in riot gear surrounded the group, displaying less-lethal weapons.

43. The Defendant County failed to have adequate policies to inform its officers on the lawful presence of members of the press at protests and, to the extent it had any such policies, failed to train officers on those policies. The training was deficient before the passage of SB 98 in 2021, codifying the right of the press to

observe and document law enforcement activities free of being struck with unlawful force, whatever its form. The training continues to be deficient even after the passage of SB 98.

44. As a consequence of the County's and Sheriff's failure, LASD deputies and officers assaulted members of the press, including members of the Plaintiff organizations, causing physical harm and fear to journalists who were just doing their jobs.

45. Defendants County and Luna had either actual or constructive knowledge of the different policies, practices, and customs alleged in the paragraphs above and the foreseeable consequences of the failure to implement and train on these state statutes and the rights they afforded to members of the press at protests. Defendants also acted or failed to act with deliberate indifference.

## VI. CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
### (First and Fourteenth Amendments to the U.S. Constitution. 42 U.S.C. § 1983; California Constitution Art. I, § 2a; California Penal Code § 409.7, Penal Code § 13652)

46. Plaintiffs reallege and incorporate herein by reference the preceding and any subsequent paragraphs in this Complaint.

47. The First Amendment and California Constitution guarantee the right of the press to access coverage of public officials, especially when they engage in law enforcement conduct in public fora. In response to the significant and unlawful restrictions against the exercise of this most fundamental right by the Defendants in recent years, the California Legislature passed, and Governor Newsom signed, Senate Bill 98 in 2021. Senate Bill 98 added Section 409.7 to the Penal Code, establishing requirements to permit press access to areas of police actions as described more fully hereinabove.

48. Significantly, this statute expressly prohibits law enforcement from assaulting members of the press to prevent, interfere or obstruct them from

"gathering information for communication to the public." Plaintiffs and their members were not engaged in any unlawful activity when they suffered the injuries described herein.

49. In doing the acts complained of herein, Defendants violated the First Amendment, Fourteenth Amendment, Article I, section 2 of the California Constitution, and California Penal Code sections 409.7 and 13652, depriving Plaintiffs and their members of their rights under the state and federal constitutions and California statutes.

## SECOND CLAIM FOR RELIEF

### Violation of the Bane Act (Cal. Civil Code § 52.1)

50. Plaintiffs reallege and incorporate by reference the preceding paragraphs as though fully set forth herein. The federal and state constitutions and relevant state statutes guarantee the right to freedom of the press, as well as to be free from unnecessary and excessive force by law enforcement officers. Defendants, by engaging in the wrongful acts and failures to act alleged above, denied these rights to Plaintiffs by threats, intimidation, or coercion, to deter, prevent and in retaliation for the exercise of the constitutional and statutory rights of Plaintiffs and their members, in violation of Cal. Civ. Code § 52.1.

51. California Civil Code, Section 52.1, known as the Tom Bane Civil Rights Act, provides that : "if a person or persons, whether or not acting under color of law, interferes by threat, intimidation, or coercion, or attempts to interfere by threat, intimidation, or coercion, with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of this state," a person may prosecute an action "for damages, including, but not limited to, damages under Section 52, injunctive relief, and other appropriate equitable relief to protect the peaceable exercise or enjoyment of the right or rights secured, including

appropriate equitable and declaratory relief to eliminate a pattern or practice of conduct." Cal. Civ. Code § 52.1.

52. As alleged herein, LASD unlawfully used force and the threat of force against Plaintiffs and their members to intimidate them and interfere with their constitutional and statutory rights to document public events as the press.

53. As a direct and proximate result of the aforementioned acts or omissions of Defendants, Plaintiffs are entitled to injunctive relief to require Defendants to end their unlawful policies, practices and customs and of Defendants that caused the violation of Plaintiffs' rights under the federal and state constitutions and statutory law.

54. Plaintiffs are entitled to an injunction pursuant to California Civil Code §52.1.

## VII. REQUEST FOR RELIEF

Wherefore, Plaintiffs seek judgment as follows:

1. A preliminary and permanent injunction restraining Defendants from engaging in the unlawful and unconstitutional actions detailed above and retaining Court jurisdiction to enforce the terms of the injunction;

2. A declaratory judgment that Defendants' alleged conduct violated Plaintiffs' rights under the federal and state Constitution and statutory laws;

3. An award of attorneys' fees pursuant to 42 U.S.C. § 1988 and Cal. Civil Code §§ 52(b) & 52.1(h) and Cal. Code of Civ. Proc. § 1021.5;

4. Costs of suit;

5. Pre- and post-judgment interest as permitted by law;

6. Such other and further relief as the Court may deem just and proper.

Dated: June 18, 2023                Schonbrun Seplow Harris Hoffman & Zeldes LLP

              /s/   Paul Hoffman   .
             By: Paul Hoffman
             Attorneys for Plaintiffs